IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SUSANNAH OVERBY, | |
| Plaintiff, | CIVIL ACTION FILE NO.: |
| v. | 1:21-cv-5256-JPB-JKL |
| NORTHSIDE HOSPITAL, INC., | |
| Defendant. | |

## FINAL REPORT AND RECOMMENDATION

This is an employment case in which Plaintiff Susannah Overby claims that her former employer, Defendant Northside Hospital, Inc., interfered with her rights under the Family and Medical Leave Act ("FMLA") and unlawfully terminated her employment in retaliation for seeking FMLA leave.  The case is before the Court on Defendant's Motion for Summary Judgment and Plaintiff's Motion for Partial Summary Judgment.  [Docs. 46, 48.]  For the reasons that follow, it is **RECOMMENDED** that both motions be **DENIED**.

## I.    BACKGROUND

### A.    Facts

In setting out the facts of this case, the Court has considered Defendant's Statement of Material Facts to Which There is No Genuine Issue to be Tried ("DSMF" [Doc. 46-17]), Plaintiff's Statement of Undisputed Material Facts ("PSUMF" [Doc. 48-2]), and the responses thereto ("R-DSMF" [Doc. 53-1] and "R-PSUMF" [Doc. 54-1]).  It has also considered the parties' additional statements of fact ("PSAF" [Doc. 53-2]; "DSAF" [Doc. 54-10]) and the responses thereto ("R-PSAF" [Doc. 55-1]; "R-DSAF" [Doc. 56-2]).  Finally, the Court has also conducted its own review of the record.  *See* Fed. R. Civ. P. 56(c)(3).

It its legal analysis below, the Court takes the facts in the light most favorable to the non-moving party and, at times, implicitly resolves objections in that manner. *See Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004).  Where there is a conflict in the evidence, the Court accepts the non-moving party's evidence as true because she or it is the non-moving party.  *See Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*, 207 F.3d 1351, 1356 (11th Cir. 2000) ("If there is a conflict between the plaintiff's and the defendant's allegations or in the evidence, the plaintiff's evidence is to be believed and all reasonable inferences must be drawn in his favor.").  Where the party responding

2

to a statement has neither refuted nor stated valid objections to the material facts as set forth in the statement, those facts are deemed admitted by operation of law. LR 56.1B(2), NDGa.; *Reese v. Herbert*, 527 F.3d 1253, 1267-69 (11th Cir. 2008). In those instances where a party denies a statement of fact (in whole or in part), the Court has reviewed the record to determine whether it is disputed and, if so, whether any dispute is material. Additionally, the Court includes some facts drawn from its independent review of the record. *See* Fed. R. Civ. P. 56(c)(3). The Court has also excluded assertions of fact by either party that are immaterial or presented as arguments or legal conclusions, as well as assertions of fact unsupported by a citation to evidence in the record, stated as a legal conclusion, or asserted only in the party's brief and not the statement of facts. *See* LR 56.1B(1), NDGa.; *see also Chapman v. AI Transp.*, 229 F.3d 1012, 1051 n.34 (11th Cir. 2000) (en banc) (subjective perceptions, conclusory allegations, or allegations that are otherwise unsupported by record evidence do not create genuine issues of material fact to withstand summary judgment); *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (same).

### B.    Plaintiff's Employment with Defendant

Plaintiff began her employment with Northside over two decades ago, on July 31, 2000, as Coordinator of Accounting.  (DSMF ¶ 1; PSUMF ¶ 1.)  She held various roles while employed by Northside,[1] but last served as Manager, Financial Planning, and Analysis ("FP&A") in Northside's FP&A department, starting in early 2018.  (DSMF ¶ 2.)  FP&A is responsible for, among other items, operating and capital budgets, cost accounting, and economic analytics.  (DSMF ¶ 4.)

As Manager in FP&A, Plaintiff had no direct reports, and reported to Ryan Cliett, Director of FP&A.[2]  (PSAF ¶ 5.)  In her role, Plaintiff worked on specific projects assigned by Cliett, including:  a project tying all vendor payments back to specific contracts authorizing those payments (the "Contracts Project"); a project related to financial reporting issues caused by doctors ordering and then returning dozens of breast implants for each surgery; and a project standardizing databases between Northside and Gwinnett Medical Center during their 2019 merger.  (PSAF

---

[1] Plaintiff's first position with Northside was Coordinator of Accounting, where she worked for roughly a year; she was then promoted to Manager of Accounting, where she stayed for another year; after that, she worked in Materials Management for about eight years; and finally, she worked in Internal Audit for ten years.  (PSAF ¶ 3.)

[2] Specifically, between 2018 and November 2019, Plaintiff reported to Cliett.  (DSMF ¶ 3.)

¶ 6.)  During the final year of Plaintiff's employment, her primary responsibility was the Contracts Project.  (PSAF ¶ 8.)

Initially, Cliett and Plaintiff got along, and Cliett was very nice to Plaintiff (DSMF ¶ 5; R-DSMF ¶ 5; Dep. of Susannah Overby [Doc. 47 ("Pl. Dep.")]  69-70); however, around June 2018, Plaintiff noticed Cliett began to be dismissive, condescending, and irritable (DSMF ¶ 6; R-DSMF ¶ 6; Pl. Dep. 70).  Still, at her deposition, Plaintiff admitted that Cliett seemed "nasty" with others at Northside, and acknowledged that he seemed to treat "everyone" that way.  (DSMF ¶ 7; Pl. Dep. 70-71.)

Despite any purported issues with Cliett, in her annual performance review for the period between October 1, 2017 and September 30, 2018, Plaintiff received an overall rating of 3.12 out of 5.0, indicating she "Met Objectives and Standards."[3] (PSUMF ¶ 14; DSAF ¶ 6.)  Then, in her last performance review with Defendant, which was completed by Cliett and covered the review period between October 1, 2018 and September 30, 2019, Plaintiff received a higher overall rating of 3.53 out of 5.0, indicating that she "Met Objectives and Standards," and, in some categories,

---

[3] Any score above 3.0 amounted to meeting objectives and standards, while a score of 4.0 or above amounted to exceeding objectives and standards.  (DSAF ¶¶ 7-8) [*See also* Doc. 54-7 (Plaintiff's pay slips).]

even "Exceed[ed] Objectives and Standards." (DSMF ¶ 8; PSUMF ¶ 15.) In fact, Plaintiff never received an "unsatisfactory" rating overall in any her performance reviews. (DSMF ¶ 16.) Plaintiff also received a raise and a bonus after her 2019 performance review. [Doc. 54-7 (paystubs).] (*See also* Dep. of Billy Wright [Doc. 45] 72-73.)

Even so, Cliett testified that Plaintiff was the lowest ranked manager of his direct reports when he managed her (Dep. of Ryan Cliett [Doc. 51] 47-48),[4] and testified that he believed that Plaintiff, in relation to the Contracts Project, often did not comprehend key elements of tasks, lacked an ability to think strategically think, and was not making a lot of progress on initiatives (*id.* 54-56; Decl. of Ryan Cliett [Doc. 46-5] ¶ 2). Defendant does not, however, appear to have identified for the Court any particular tasks or initiatives implicated by these general criticisms.

Notably, Northside's Performance Evaluations policy provides that "employees should be provided feedback and coaching [from their supervisors or at least someone in the department] regarding performance issues during a performance cycle," [Doc. 49-3; Dep. of Cynthia Gist [Doc. 50] 29]; yet Cliett

---

[4] It does not appear that Defendant produced documentation in support of Cliett's testimony on this point. (*See* R-DSAF ¶ 9.)

admitted that he did not discuss his critical observations with Plaintiff at the time (DSMF ¶ 13; R-DSMF ¶ 13).  And while Cliett explained that, as will be discussed below, he intended to move Plaintiff under the supervision of another manager, Billy Wright (Cliett Dep. 48), he also could not recall discussing Plaintiff's performance problems, or indeed Plaintiff's performance at all, with Wright during the transition.  (PSAF ¶ 20; Cliett Dep. 52-53; Wright Dep. 48-49.)

**C.    Merger and Plaintiff's Transfer**

In August 2019, the Gwinnett Health System merged into the Northside Hospital system.  (DSMF ¶ 14.)  Wright, a 22-year employee of Gwinnett Medical Center and its Director of Corporate Finance, was transferred to Northside in late 2019 or early 2020 as part of the merger.  (DSMF ¶ 15; PSAF ¶ 9.)  Following the merger, Wright held the same role—Director of Corporate Finance—with Defendant, and reported to Cliett.  (DSMF ¶ 16.)

In the Fall of 2019, Cliett moved Plaintiff under Wright's supervision.[5] (DSMF ¶ 17.)  Cliett testified that he believed he had "too many director reports" at the time, and also that he thought that Plaintiff could benefit from the attention

---

[5] Wright supervised her and one other employee, Josh Whittington.  (PSAF ¶ 9.)

of someone as experienced as Wright.  (DSMF ¶ 19; DSMF ¶ 20; R-DSMF ¶ 20.)

As noted above, Cliett did not discuss his assessment of Plaintiff's performance

with Wright prior to the transfer.  (DSMF ¶ 21.)

### D.  Plaintiff's Surgery

In October 2019, Plaintiff suffered from a chronic torn ACL and torn

meniscus, and began wearing a stabilizing brace at work.  (PSUMF ¶ 4; PSAF ¶

26.)  Plaintiff learned too that she would need surgery to repair her knee.  (DSMF

¶ 22.)  Plaintiff and her doctor agreed she should have surgery in the beginning of

2020.  (DSMF ¶ 23.)  As a result, Plaintiff did not initially apply for FMLA leave

in October 2019, but told Cliett and Wright she would eventually need surgery.

(DSMF ¶ 24.)

At the time Plaintiff applied for FMLA leave—as will be discussed below,

she applied multiple times between January and April 2020—she was unaware of

any alleged issues with her performance.  (PSAF ¶ 44.)  According to Plaintiff,

when she told Cliett about her need for leave, he "couldn't be bothered [and h]e

said 'whatever.'"  (DSMF ¶ 25.)  Indeed, Cliett appeared annoyed with Plaintiff's

FMLA applications and rolled his eyes when he received her application notices.

(PSAF ¶ 42.)  But at that time, no one told Plaintiff she could not take FMLA leave or could not have surgery.  (Pl. Dep. 111.)

In January 2020, Plaintiff's knee surgery was scheduled for February 4, 2020. (DSMF ¶ 28.)  Under Northside policy, for any leave of absence longer than three days, an employee must initiate a leave request by contacting Cigna, Northside's third-party administrator.  (DSMF ¶ 29.)  Cigna first reviews and confirms employee eligibility (DSMF ¶ 30); then it sends the employee confirmation of that approval (DSMF ¶ 31).[6]  The length of any FMLA leave is determined by Cigna and the employee's doctor.  (PSAF ¶ 29.)

Around January 22, 2020, Plaintiff contacted Cigna and requested FMLA leave for her surgery scheduled for February 4.  (DSMF ¶ 32; R-DSMF ¶ 32.)  Cliett received notice that Plaintiff had requested leave and would be informed if the leave was approved.  (Cliett Dep. 17.)  In response, Cigna indicated that Plaintiff's request was "Eligible – Pending Determination," which meant she "met the minimum requirements but ha[d] not been approved."  (DSMF ¶ 33.)  At the time, Plaintiff took this to mean that her leave would at least be approved when the

_____

[6] As Plaintiff notes, these are not the only notices Cigna sent to employees, as she also received notices about "pending determination[s]."  (R-DSMF ¶ 31 (citing Pl. Dep. 111-13).)

surgery actually took place.  (PSAF ¶ 32; Pl. Dep. 112-13.)  Accordingly, Plaintiff informed Cliett and Wright that her surgery had been scheduled and told them the dates she would be out on FMLA leave.  (PSAF ¶ 30.)  Additionally, supervisors are notified, apparently by Cigna, if and when an employee requests FMLA leave and when the leave is approved.  (DSMF ¶ 40; R-DSMF ¶ 40.)

Around January 29, 2020, while Plaintiff's request was still pending, Plaintiff's physician cancelled the surgery.  (DSMF ¶ 36.)  Plaintiff contacted Cigna and cancelled her FMLA leave request that same day.  (DSMF ¶ 37; PSUMF ¶ 8.)  Plaintiff testified that "nobody ever said anything" about denying her leave request.  (Pl. Dep. 113.)

### E.    Wright Takes Issue with Plaintiff's Performance

Wright testified that in his role as manager, he continually assessed and supported his direct reports, and normally had one-on-one meetings to check in, to receive reports on their progress and other updates, and to provide assistance.  (Dep. of Billy Wright [Doc. 45] 31-32, 38, 64-66.)  Wright and Plaintiff both confirmed that the two held weekly one-on-one meetings.  (DSMF ¶ 42; R-DSMF ¶ 42; PSAF ¶ 10.)  Wright also met regularly with Cliett to discuss Wright's direct reports

(DSMF ¶ 43), though he never shared information from these conversations with Plaintiff (PSAF ¶ 67).

Plaintiff testified that during her meetings and calls with him, Wright provided good feedback, positive support, and encouraging words; he liked her ideas; was very supportive; and frequently said things such as, "I like where you're going with this, I like what you're doing here."[7]  (Pl. Dep. 137, 159-60; Decl. of Suzannah Overby [Doc. 54-13 ("Pl. Decl.")] ¶¶ 6-7.)  As previously mentioned, Plaintiff was unaware of any alleged issues with her performance (PSAF ¶ 44), and Plaintiff did not believe any of Wright's coaching amounted to "negative feedback" (Pl. Dep. 137).

---

[7] Defendant objects to consideration of Plaintiff's testimony about Wright's statements as "inadmissible hearsay."  (R-PSAF ¶¶ 11, 12, 13, 14 (citing Fed. R. Evid. 802).)  The Court overrules this objection because Plaintiff's testimony regarding Wright's statements are not offered—at least not primarily—to prove the truth of the matter asserted, but to show that Wright was in fact satisfied with her performance and to support Plaintiff's argument that the stated reasons for her discharge were pretextual.  *See Moore v. Sears, Roebuck & Co.*, 683 F.2d 1321, 1323 (11th Cir. 1982) (finding that supervisors' statements about a plaintiff's performance were not hearsay).  To the extent Plaintiff's testimony is offered to prove that Plaintiff was performing well, Federal Rule of Evidence 801(d)(2)(D) also defines it as non-hearsay because the Wright made the statements on matter within the scope of his employment with Defendant.  *See Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1208-09 (11th Cir. 2013) (supervisor's statements are admissible if the supervisor is involved with adverse employment action).

Despite this, in March 2020, Wright prepared a short, less-than-half-page memorandum opining very generally that Plaintiff had "[l]ow productivity," "wait[ed] for guidance," needed "hand hold[ing]," failed to produce "workload [at a] management level," showed few "accomplishments," and "often disappears." (Wright Dep. 34, Ex. 9.)  Wright's memo also stated that an "Email Audit showed little workload traffic."  (*Id.*)  Wright testified that "in some of the tasks" she was assigned, he would discover that "progress was not being made," and would "just take the lead" since "she hadn't been able to do it on her own."  (*Id.* 90-91.)  Cliett testified that he observed similar conduct when he previously supervised Plaintiff. (Cliett Decl. ¶ 3.)  It does not appear that either identified any particular tasks Plaintiff did not complete, but rather, explained their concerns at a high level of abstraction.

Wright never shared the list of alleged performance issues with Plaintiff; and it is undisputed that Plaintiff only learned that Northside allegedly believed there may have been issues with her performance after she retained counsel in this matter. (PSAF ¶ 45.)  According to Plaintiff, she was never counseled about her purported low productivity, waiting for guidance, need for handholding, low workload, or otherwise told that she was "spinning [her] wheels without progress"; producing

few accomplishments; or that she "disappeared" or was not in her office enough. (Pl. Decl. ¶¶ 11, 13, 16-17, 19.)  To the contrary, Plaintiff testified that she often worked more than forty hours per week; would, with Wright's knowledge, often attend meetings and work outside of her personal office; and performed work via calls and meetings rather than via email.  (PSAF ¶¶ 57-58; R-PSAF ¶ 58; Pl. Decl. ¶ 26.)  Indeed, it is undisputed that Plaintiff's email traffic would not reflect all the work she performed for Northside because she often performed work unrelated to email.  (PSAF ¶ 63.)  As to the email audit itself, there appears to be no documentation that exists in support, and only Wright could recall anything about the audit, saying that while he was "aware" that Cliett had "pulled an e-mail audit" of Plaintiff, he (Wright) never saw it, could not remember the dates, and could not answer if the audit took place while he (Wright) was supervising Plaintiff. (PSUMF ¶ 32; R-DSMF ¶ 32; Wright Dep. 39-41.)  Cliett, meanwhile, testified that he did not conduct an email audit of Plaintiff and could not recall one ever being conducted.  (Cliett Dep. 40; PSAF ¶ 61.)  Cynthia Gist, Defendant's Employee Relations Director, too, could not recall one being performed. (Gist Dep. 44-45.)  In any event, Plaintiff was never told that Wright, Cliett, or anyone else at Northside performed an audit of her email, has never seen any audit of her email,

13

was never coached or counseled by Wright, Cliett, or anyone else at Northside regarding anything that they allegedly uncovered based on a supposed audit of her email, and understands no such audit was produced during this litigation.  (PSAF ¶ 62.)

In terms of discussing the problems, Cliett does not recall when he first talked with Wright about Plaintiff's alleged performance issues (PSAF ¶ 68), nor does he recall asking Wright "[w]hat steps [he had] made to help [Plaintiff] improve her performance" (Cliett Dep. 52).  And neither party has produced further email communications between Cliett and Wright regarding Plaintiff's performance.  So while Cliett's expectation was that Wright was discussing Plaintiff's alleged performance deficiencies with her (PSAF ¶ 71), Cliett himself never discussed those deficiencies with her or confirmed that Wright had (PSAF ¶ 72).[8]  Still, Wright believes that Plaintiff's performance issues should have been apparent to her without any specific warning on his part.  (Wright Dep. 65; Decl. of Billy Wright [Doc. 46-7] ¶ 6.)

_____

[8] Gist also did not meet with Plaintiff about her alleged performance problems.  (PSAF ¶ 73.)

Ultimately, based on Wright's conversations with Cliett, Cliett recommended that Wright contact Gist, the Employee Relations Director, which he did on March 9, faxing her the memorandum about Plaintiff's alleged performance problems. (DSMF ¶ 47; PSAF ¶ 49.) The two spoke by phone that same day. (DSMF ¶ 49; R-DSMF ¶ 49.)

### F.   Plaintiff's Surgery is Rescheduled

Plaintiff's surgery was rescheduled for March 26, 2020. (DSMF ¶ 51; PSUMF ¶ 9.) In early March, Plaintiff submitted an FMLA leave request to Cigna for the surgery, with leave to begin that same day; and in response, Cigna sent Plaintiff a package indicating that her FMLA leave would run from March 26 through May 6. (DSMF ¶ 52; DSMF ¶ 10; Pl. Dep. 120, Ex. 6.) Plaintiff also notified Wright that the surgery was rescheduled, and in response, Wright said "whatever you need." (DSMF ¶ 53; PSAF ¶ 35.) On March 11, Cigna sent Plaintiff a letter stating her FMLA leave was "Eligible – Pending Determination." (DSMF ¶ 55.) Cigna also notified Cliett by email that same day; Cliett then forwarded the email to Wright, saying "Leave [Gist] a vmail on this"; and Cliett forwarded it to Gist, writing, "Per our conversation." [Doc. 53-14 (Mar. 11, 2020 Email Chain).]

On March 17, 2020, Plaintiff's March 26 surgery was cancelled due to COVID and was not immediately rescheduled.  (PSAF ¶ 36; R-DSMF ¶ 56.) Plaintiff contacted Cigna on March 17 and cancelled her FMLA leave as well. (DSMF ¶ 57; PSUMF ¶ 11.)

Plaintiff's surgery was soon after rescheduled for May 1, 2020.  (DSMF ¶ 59.)  However, within a day or two—around April 1, 2020—the surgery was again canceled due to COVID-19 and not immediately rescheduled.  (DSMF ¶ 60; PSUMF ¶ 12; DSMF ¶ 61.)  Plaintiff did not request FMLA leave through Cigna for the May 1 surgery because she simply "didn't have a chance," and her medical providers had not yet rescheduled it.  (Pl. Dep. 130-31.)  Plaintiff also did not inform anyone with Defendant of her May 1 surgery date, because it "got cancelled . . . right away." (*Id*. 130, 132-33.)  But Plaintiff testified that the "surgery was going to happen and everyone knew it," and that it was simply "a matter of getting surgery scheduling to stop delaying it for COVID." (*Id*. 152.)

That said, no one stopped Plaintiff from applying for FMLA leave for her February 4, March 26, or May 1 surgeries (DSMF ¶ 102); no one told Plaintiff she could not have surgery (DSMF ¶ 106); and the last FMLA leave request Plaintiff had pending was for her March 26 surgery date (DSMF ¶ 103).  Plaintiff also

admitted that no one with Defendant "told [her] that [she] would be fired for taking FMLA leave," and "no one told [her that her] job was in jeopardy for any reason." (Pl. Dep. 144.)

### G.    Northside's Performance and Disciplinary Policies

Northside has a Performance Evaluation policy, [9] which provides that Performance Improvement Plans ("PIPs") "will be implemented when an employee receives an overall unsatisfactory rating during the performance evaluation period" and "will ensure an employee receives ample time to demonstrate improvement." (PSUMF ¶ 17.)  And while the policy allows that employees with unsatisfactory ratings at the end of a PIP "may be subject to demotion or termination from employment," such employees still have access to a grievance process that allows them to appeal that decision to a second-level reviewer and to Human Relations. (Wright Dep., Ex. 4.)

Plaintiff was never placed on a PIP.  (PSUMF ¶ 18; R-DSMF ¶ 66.) According to Wright, "based on the conversations that . . . we had on [Plaintiff]'s performance, I think we made the determination that we didn't see [her

---

[9] The policy is entitled "Performance Evaluation," but is alternatively referred to by the parties as a Performance Evaluation Policy and a Performance Improvement Policy.

performance problems] . . . reversing or getting any better." (Wright Dep. 65.) Based upon her belief that Wright was correct in his assessment of Plaintiff and had been coaching Plaintiff for months, Gist concurred, opining that a PIP would not have resulted in a different outcome for Plaintiff. (Gist Dep. 84-86.) It is unclear whether a PIP should have been implemented in Plaintiff's circumstances. According to Cliett, it was not mandatory, but he also admitted that he and Wright never discussed placing Plaintiff on a PIP before they decided to terminate her employment. (Cliett Dep. 45-46.)

Along these lines, Northside also has a Progressive Discipline policy,[10] which states "[i]n most cases, one or more less severe steps will be taken prior to dismissal of a hospital employee for . . . standard of conduct, service excellence, and performance deficiencies." (PSUMF ¶ 19; *see also* Gist Dep. Ex. 5 (Progressive Discipline policy).) It lists "six (6) measures: verbal warning, written warning, suspension, demotion, job in jeopardy warning, or separation" that may be taken pursuant to the policy. (PSUMF ¶ 20.) While the Progressive Discipline policy states that employees "may be dismissed without prior warning for

---

[10] The Progressive Discipline policy specifically states that "Performance Improvement Plans may be used in conjunction with progressive discipline to ensure performance issues are corrected." (Wright Dep. Ex. 4; PSAF ¶ 89.)

violations of major hospital rules and regulations," it only identifies conduct such as "fighting, theft, substance or alcohol consumption on hospital-owned premises, patient abuse or refusing to carry out an assignment" as examples of "crisis situations" that would justify discharge without warning.[11]  (PSUMF ¶¶ 21-22.)

All testimony appears to indicate that Plaintiff never received any verbal warning, written warning, or any other lesser measures under the Discipline Policy prior to her discharge.  (PSUMF ¶ 23; R-PSUMF ¶ 23; Pl. Dep. 45; Wright Dep. 45-46, 48-49; Cliett Dep. 29-30, 55.)  According to Plaintiff, Cliett never "directly or indirectly" told her there was a problem with her performance, and Wright never indicated there was a problem with her performance either.  (Pl. Decl. ¶¶ 6-7; Cliett Dep. 48; Wright Dep. 65.)

## H.   The Termination of Plaintiff's Employment

Cliett, Gist, and Wright were the three individuals who made, participated in, reviewed, approved, or were otherwise involved in the decision to terminate

---

[11] Gist listed theft, deliberate neglect of patient care, and being impaired while on duty as examples of conduct that would warrant terminating an employee without following the Progressive Discipline policy.  (PSAF ¶ 97.)  She disclaimed that issues such as attendance problems would result in a PIP, much less termination.  (PSAF ¶ 98.)

Plaintiff's employment (PSUMF ¶ 27); and all had knowledge of Plaintiff's requests for FMLA leave.  (PSUMF ¶ 29.)

Beginning in March 2020, the COVID-19 pandemic caused a reduction in patient volume, negatively impacting Northside's financials.  (Cliett Decl. ¶ 4.) According to Cliett's declaration, the financial impact of the COVID-19 pandemic required Northside to consider how to decrease fixed costs.  (*Id.* ¶¶ 4-5.)

With regard to Plaintiff specifically, Cliett testified that, "once [Wright] spent as much individual time with her as he did, his assessment of her performance merited termination."  (Cliett Dep. 59.)  Cliett thought that Wright saw a "lack of progression – let's call it initiative, drive, and . . . the ability to thing about things and answer the bigger question versus sitting down and being told exactly what needs to happen."  (*Id.* 59-60.)  At the same time, Cliett admitted that he had not even had a one-on-one conversation with Plaintiff about her performance problems between October 2019 (when he provided her last performance evaluation) and when she was discharged.[12]  (*Id.* 49, 59.)

---

[12] In declaration testimony, Cliett states that the financial impact of the pandemic, alongside Plaintiff's "poor performance," made it "prudent" to pursue termination (Cliett Decl. ¶¶ 4, 5), though there does not appear to be any evidence to suggest anyone informed Plaintiff that such concerns about Defendant's financial condition had any bearing on her discharge (*see* R-DSAF ¶ 70).

On May 8, 2020, Wright sent an email to Gist to discuss the possibility of terminating Plaintiff's employment, which attached an updated memorandum—still less than a page in length—regarding Plaintiff's alleged performance deficiencies.[13]  (PSUMF ¶ 33; Pl. Dep. 73-74, Wright Dep. Ex. 17.)  In it, he opined that as of Fall 2019, Plaintiff "had been spinning her wheels for a while without making progress," and that while she was presently "willing to work on whatever we ask," he expected a "manager [] to lead and take initiative to bring projects to a close."  (Wright Dep. Ex. 17.)  Wright also generally identified problems with her progress on her current goals, her ability to identify creative solutions, her initiative, her capacity for coordinating with other departments, her ability to understand expectations, and her documentation and presentation skills.  (*Id.*)  In terms of specific criticisms, Wright focused entirely on aspects of the Contracts Project, discussing how Plaintiff's sole goal for fiscal year 2020 was to "[e]stablish a process to reconcile/match contractual related payments out of Accounts Payable back to contractual agreements out of legal," but also explaining that she had only made "sluggish progress," was unable to "come up with creative solutions," and

---

[13] Employee Relations is consulted on every termination.  (DSMF ¶ 76.) Gist's role was to provide counsel in the termination process and a recommendation on whether there is enough information to terminate an employee.  (DSFM ¶ 77.)

required too much assistance meeting expectations. (*Id.*) Despite highlighting purported issues with her progress on the Contracts Project, Wright indicated in his memorandum that there were no plans to backfill Plaintiff's position if she were discharged. (*Id.*)

Gist recalls Wright being very thorough and detailed and, when questioned, being able answer questions asked about Plaintiff articulately. (Gist Dep. 62, 85.) Based upon their conversations, Gist testified that she trusted Wright's review, his knowledge about his employee, and his expectations about her. (*Id*. 62, 69-70.) But even though Gist was consulted, she testified that she was not a decisionmaker with regard to employees' discharges; instead, she merely provided a recommendation to the decisionmakers about whether there was "enough" to fire any particular employee. (*Id*. 61-62, 86.) In Plaintiff's case, Cliett and Wright made the final decision to terminate Plaintiff's employment. (DSMF ¶ 83.)

On May 13, 2020, Wright notified Plaintiff of the termination of her employment during a call. (DSMF ¶ 85; PSAF ¶ 75.) Gist was also present for the conversation. (*Id.*) Prior to the call, Plaintiff believed it would be a routine weekly update call with Wright, and said that her discharge came "out of the blue." (Pl. Dep. 88-89, 144; PSAF ¶ 80; R-PSAF ¶ 80.)

According to Plaintiff, during the call, she asked why she was being discharged, to which Gist responded "you're a manager."[14]   (Pl. Dep. 147.) Plaintiff then asked, "if this is performance-related, why . . . haven't I been spoken to and why haven't I been given a . . . performance improvement plan?" to which Gist replied, "we are where we are."  (*Id*. 147, 154; Gist Dep. 75.)  Plaintiff was never told her employment was terminated for financial reasons (PSAF ¶ 107), and Plaintiff believes she was terminated because she repeatedly applied for FMLA leave, as "[i]t had become a hassle because the surgeries kept getting canceled and kept getting rescheduled, and it was all this paperwork" (Pl. Dep. 90-91).  While Plaintiff was notified of her discharge on the May 13, the termination was not effective until May 27, 2020.  (PSUMF ¶ 24.)

Cliett admitted that Plaintiff's duties with respect to "contract compliance and utilizing this information to help the FP&A" actually "sat on the back burner for a little bit" following her discharge (Cliett Dep. 28-29), and Wright could not recall who had responsibility for certain compliance obligations Plaintiff handled or if they were ever completed (Wright Dep. 79-80).  To date, the Contracts Project,

---

[14] Defendant objects to consideration of Plaintiff's testimony about the meeting on hearsay grounds.  (*See* PSAF ¶¶ 76-79.)  For the same reasons explained in footnote 6, Defendant's objection is overruled.

which was Plaintiff's "primary responsibility" before her May 2020 termination, which was a "big focus" for Defendant's Controller, and which was cited as a basis for her firing, has still not been completed, over two years after Plaintiff's discharge. (PSAF ¶ 85.) "Contract compliance" is still in a work in progress, with the employee responsible still trying to "leverage[e] other members of her team to assist in this effort." (Cliett Dep. 28-29.)

## I. Plaintiff's Surgery

Plaintiff did not have an active FMLA leave request pending with Cigna at the time she was discharged, because her May 1 surgery had been cancelled soon after it was scheduled, and she had not been able to reschedule when she was fired. (Pl. Dep. 131-32, 153.) Still, Wright, Cliett, and others knew that Plaintiff's surgery would eventually be rescheduled and that she would need to use FMLA leave for it. (Wright Dep. 29, Ex. 12; Pl. Dep. 181-83; Def. Resps. to Pl. Interrogs. [Doc. 50-15] No. 5.)

Plaintiff rescheduled her surgery for May 26, 2020, thirteen days after she was notified that her employment would be terminated. (DSMF ¶ 89; PSUMF ¶ 25.) At that point, Plaintiff did not request FMLA leave because she had already been fired. (DSMF ¶ 90.) She also testified that she did not tell anyone at Northside

24

of her May 26 surgery, because there was "no point."  (DSMF ¶ 91; Pl. Dep. 131-33; 153-54.)

## II.    SUMMARY JUDGMENT STANDARD

A court should grant summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  The movant bears the initial burden of showing that it is entitled to summary judgment.  *Id.* ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (holding that *Celotex* did not change the rule that the movant bore the initial burden, and stating, "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial"). The movant may carry its burden by showing the court that there is "an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.

"Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark*, 929 F.2d at 608.  The nonmovant is then required "to go beyond the pleadings" and to present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotation omitted); *see* Fed. R. Civ. P. 56(c).  "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005). Resolving all doubts in favor of the nonmoving party, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  In evaluating a summary judgment motion, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor. *Id.* at 255.

## III.   THE PARTIES' ARGUMENTS FOR SUMMARY JUDGMENT

Plaintiff brings two claims, an FMLA inference claim and an FMLA retaliation claim.  Defendant argues that summary judgment should be granted on both claims.  [Doc. 46.]  As to the FMLA interference claim, Defendant contends

that because Plaintiff did not have an active FMLA request pending with or approved by Cigna at the time of her discharge, she cannot establish that she was even entitled to invoke the FMLA's protections or that she was denied any benefit to which she was entitled. [Doc. 46-1 at 13-15.] It also asserts that because no one with Defendant knew of Plaintiff's "alleged need for FMLA leave on May 26, 2020," it could not have willfully interfered with Plaintiff's FMLA rights and would have terminated her employment regardless of her need for leave. [*Id.* at 15-18.] In doing so, Defendant seeks to distinguish Plaintiff's communicated need for leave on specific dates with her "*eventual* need for leave" for knee surgery at some point in the future, arguing that the latter cannot support a cause of action for interference. [*Id.* at 17.] As to Plaintiff's retaliation claim, Defendant argues that Plaintiff cannot demonstrate that its stated reasons for her discharge were pretext for retaliation. [*Id.* at 19-25.]

Plaintiff counters that the undisputed evidence affirmatively establishes Defendant's liability for interference under the FMLA and that she is entitled to summary judgment on her interference claim. [Doc. 48-1.] Specifically, Plaintiff argues that the evidence shows that she was an eligible employee under the FMLA, that she suffered from a serious health condition, that Northside had sufficient

notice of her need for FMLA leave in the immediate future, and that she was therefore entitled to FMLA leave; and that by discharging her while knowing she still needed it, Defendant interfered with her FMLA rights. [Doc. 48-1 at 10-20; Doc. 54 at 9-10.] Plaintiff also argues that Defendant cannot avoid liability by demonstrating that its reasons for discharging her were "wholly unrelated to her FMLA leave," since, according to Plaintiff, Wright and Cliett knew of her need for leave and only began manufacturing issues with her performance as a result of her applications for FMLA leave. [Doc. 54 at 10-18.] Finally, Plaintiff argues that material issues of fact preclude summary judgment on her retaliation claim, since she can establish a prima facie case of retaliation, and a reasonable factfinder could conclude that Defendant's stated reasons for her discharge were pretext for retaliatory motive. [*Id.* at 18-25.]

## IV.   DISCUSSION

The FMLA provides that an eligible employee[15] is entitled to a maximum of twelve weeks of leave during any twelve-month period because of a serious health

---

[15] There is no dispute that Defendant employed more than 50 employees within a 75-mile radius of Northside Hospital, where Plaintiff worked, or that Plaintiff worked more than 1250 hours for Northside between May 13, 2019, and May 13, 2020 (PSUMF ¶¶ 2-3), meaning that she was an eligible employee as defined by the FMLA (PSUMF ¶ 6).

condition that makes the employee unable to perform the functions of her position, among other reasons.  29 U.S.C. § 2612(a)(1).  To protect those rights, the FMLA recognizes two types of claims:  "interference claims, in which an employee asserts that h[er] employer denied or otherwise interfered with h[er] substantive rights under the Act, and retaliation claims, in which an employee asserts that h[er] employer discriminated against her because [s]he engaged in activity protected by the Act." *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001) (internal citations omitted); *see also* 29 C.F.R. § 825.220(c) ("[E]mployers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions[.]").  As noted above, Plaintiff asserts both an FMLA interference and an FMLA retaliation claim in this case, and the undersigned addresses the parties' arguments in relation to each below.

### A.   Interference

The FMLA makes it illegal "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1).  "To prove FMLA interference, an employee must demonstrate that [s]he was denied a benefit to which [s]he was entitled under

the FMLA." *Martin v. Brevard Cnty. Pub. Sch.*, 543 F.3d 1261, 1266-67 (11th Cir. 2008) (citing 29 U.S.C. § 2615(a)(1) and *Strickland v. Water Works and Sewer Bd. of Birmingham*, 239 F.3d 1199, 1206-07 (11th Cir. 2001)). The employee must also demonstrate that she "has been prejudiced by the violation in some way." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002).

As to Defendant's first two arguments for summary judgment—that because Plaintiff did not have an "FMLA request pending or approved with Cigna" when she was fired and/or her supervisors were unaware of any active request when they decided to fire her, she somehow failed to "invoke her right to FMLA protected leave" and therefore cannot made out an interference claim [Doc. 46-1 at 14-15]— the undersigned cannot agree.

In *Pereda v. Brookdale Senior Living Communities, Inc.*, the Eleventh Circuit addressed whether interference claims could be maintained for an employer's conduct after an employee has disclosed their need for leave, but before the employee is technically eligible under the FMLA, and held that that "because the FMLA requires notice in advance of future leave, employees are protected from interference prior to the occurrence of a triggering event." 666 F.3d 1269, 1274 (11th Cir. 2012). More specifically, looking at the FMLA's requirements that

30

employees provide as much "advanced notice" for FMLA triggering events as is reasonably practicable, *see* 29 U.S.C. 2612(e); *see also* 29 C.F.R. § 825.302, the Circuit explained that it would be "illogical to interpret the notice requirement in a way that requires employees to disclose requests for leave which would, in turn, expose them to retaliation, or interference, [but] for which they have no remedy." *Id.* (quoting *Reynolds v. Inter-Indus. Conf. on Auto Collision Repair*, 594 F. Supp. 2d 925, 928 (N.D. Ill. 2009)) (marks omitted).  Consequently, it held that the "FMLA regulatory scheme must necessarily protect pre-eligible employees such as [plaintiff], who put their employers on notice of a post-eligibility leave request." *Id.*  Concerned too that employers might "evade the FMLA by blacklisting an employee that the employer suspects is likely to take advantage of the [FMLA]," the Circuit Court held that any employee—who is not yet eligible to take leave, but who will be whenever leave is ultimately set to commence—in fact "has a cause of action [for interference] if an employer terminates her in order to avoid having to accommodate that employee with rightful FMLA leave rights once that employee becomes eligible." *Id.* at 1274-75.

And while *Pereda* addressed the issue in the context of pregnancy and the particular advance notice requirements associated with that, in a subsequent case,

31

*Benz v. Crowley Maritime Corporation*, the Eleventh Circuit confirmed that the holding also applied to pre-eligibility interference claims involving "serious health conditions."[16]  *See Benz,* 732 F. App'x 794 (11th Cir. 2018); *see also Sparks*, 580 F. App'x at 766 (applying *Pereda*'s holding, but finding plaintiff "did not request leave or provide any information related to the timing or duration," and did not know if he needed surgery or time off for any surgery that did occur, thereby distinguishing the case).  In *Benz*, the plaintiff had worked for a warehousing employer for over a decade, going from warehouse employee to operations manager, when her child became sick with cancer.  732 F. App'x at 796-97.  She

_____

[16] On reply, Defendant seeks to distinguish *Pereda* because it was issued on the appeal of a motion to dismiss and, therefore, "never reached merits of the plaintiff's interference claim."  [*See* Doc. 55 at 3-4.]  Although it is true in a superficial sense that the Eleventh Circuit in *Pereda* did not address the merits of the plaintiff's interference claim, it was only because the parties' arguments focused on the procedural issue of whether an employee who will become eligible for FMLA leave—but is not yet eligible—is entitled to protection against interference prior to the triggering event, which it answered in the affirmative.  *See Pereda*, 666 F.3d at 1274.  And of course, *Benz* was decided upon a motion for summary judgment, and reversed the district court's order awarding summary judgment in favor of the employer on the substance of the inference claim.  *See* 732 F. App'x at 805.  Indeed, that case ultimately went to trial on the plaintiff's FMLA interference and retaliation claims.  *See Benz v. Crowley Logistics, Inc.*, No. 3:15-cv-00728-HLA-MCR, Docs. 97-110] (M.D. Fla. 2018); *see also Sparks v. Sunshine Mills, Inc.*, 580 F. App'x 759, 766 (11th Cir. 2014) (applying *Pereda*'s holding at summary judgment).  Accordingly, Defendant's attempt to distinguish *Pereda* (and presumably its progeny) fails.

took FMLA leave, and then returned to work. *Id.* at 797-98. Meanwhile, the company began preparing layoffs, and eventually identified the plaintiff as a candidate for discharge. *Id.* at 798-800. Significant for Defendant's argument here, although the *Benz* plaintiff made another request for FMLA leave, which was approved, she subsequently withdrew it, asking instead to use accrued vacation leave; and it was only then—after seeking to withdraw her FMLA but before any leave was scheduled to begin—that the plaintiff was discharged. *Id.* at 800. Relying on *Pereda*, the Eleventh Circuit found that the plaintiff's discharge did not serve to "foreclose [her] FMLA interference claim," and held instead that an FMLA plaintiff can advance an interference claim so long as she can show that (1) she would have been eligible for leave if it were to have taken place, and (2) her request for FMLA leave was a "the proximate cause of her termination." *Id.* at 804-05.

In this case, it is undisputed that Plaintiff was eligible to take FMLA in the first half of 2020; that she made multiple requests for FMLA that were approved pending her actual surgery; that she would have been eligible if her surgery has proceeded as scheduled any of the first three times (but did not due to the start of a global pandemic); and that she would have been eligible for FMLA on May 26, 2020, when it actually occurred, had she not been fired first. The undersigned finds

that these facts place the case squarely within the ambit of *Benz*'s holding, and that, Defendant's arguments, based upon the fact she did not have an active FMLA leave request pending precisely when her supervisors decided to fire her or in fact fired her, are unavailing.  It is undisputed that her supervisors knew she had engaged in protected activity in requesting FMLA leave in January and March 2020 for a surgery Plaintiff informed them would be necessary in the near future; and as a result, the only remaining question for Plaintiff's interference claim at this juncture is whether there is sufficient evidence that her requests for FMLA leave were the proximate cause of her discharge.  *Benz*, 732 F. App'x at 804-05 ("In other words, the crux of the issue is whether [defendant] terminated [plaintiff] for reasons unrelated to her request for FMLA leave."); *Sparks*, 580 F. App'x at 766 ("[B]ecause the FMLA requires notice in advance of future leave, employees are protected from interference prior to the occurrence of a triggering event . . . [and] a pre-eligible employee has a cause of action if his employer terminates him in order to avoid having to accommodate that employee with rightful FMLA leave once the employee becomes eligible.") (citing *Pereda*, 666 F.3d at 1271-72).

As the Eleventh Circuit has explained, the analysis of that question maps precisely onto the question of whether Plaintiff was fired in retaliation for engaging

in protected activity. *See Benz*, 7323 F. App'x at 805 ("Because we conclude that [plaintiff] has presented a triable issue as to whether [defendant] fired her in retaliation for her request for FMLA leave, we likewise conclude that there is a triable issue as to whether [plaintiff]'s FMLA leave was the proximate cause of her termination, or whether [defendant] would have terminated [plaintiff] for reasons unrelated to her request for FMLA leave.").  In other words, the analyses of Plaintiff's interference claim and retaliation claims must both look at the same adverse action—her discharge—and ask whether a reasonable factfinder could conclude that it was proximately caused by Plaintiff's requests for FMLA leave.[17] *Cf. Batson v. Salvation Arm*y, 897 F.3d 1320 (11th Cir. 2018) ("At summary judgment . . . the analyses for an FMLA interference claim based on an employee's termination and an FMLA retaliation claim are essentially the same.").  And

_____

[17] This is also true for purposes of Plaintiff's partial motion for summary judgment on her interference claim.  Contrary to Plaintiff's argument that "Northside's motivation is irrelevant," [*see* Doc. 54 at 12-13], in cases involving an employee's pre-eligibility discharge, the Eleventh Circuit has emphasized that, in fact, "what matters for [a plaintiff]'s FMLA interference claim is <u>why</u> she was terminated, not <u>when</u> she was terminated." *Benz*, 732 F. App'x at 805 (emphasis in original).  So if Defendant can offer evidence from which a reasonable factfinder could conclude that "the employee would have been dismissed regardless of any request for FMLA leave," it can avoid summary judgment against it on Plaintiff's motion. *Id.* (quoting *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1236 (11th Cir. 2010)) (internal marks omitted).

because the survival of Plaintiff's interference claim is based upon the Court's analysis of Plaintiff's retaliation claim below, the Court proceeds directly to that analysis.[18]

### B.    Retaliation

"To prove FMLA retaliation, the plaintiff must show that her employer intentionally discriminated against her for having exercised an FMLA right." *Diamond v. Hospice of Fla. Keys, Inc.*, 677 F. App'x 586, 594 (11th Cir. 2017); *see also* 29 C.F.R. § 825.220(c).  Because there is no direct evidence of retaliatory animus in this case [*see* Doc. 46-1 at 18; Doc. 54 at 18-19], the Court analyzes the FMLA retaliation claim under the familiar *McDonnell Douglas*[19] burden-shifting framework.  *See Batson*, 897 F.3d at 1328.  Under that framework, an employee must first demonstrate a prima facie case of retaliation by showing "(1) that she engaged in statutorily protected conduct, (2) that she suffered an adverse employment action, and (3) that a causal connection exists between the two."  *Id.* If the employee establishes a prima facie case of retaliation, the burden then shifts

---

[18] As noted, the Court will address Defendant's other interference argument—namely, that "Northside would have terminated Plaintiff's employment regardless of any need for FMLA leave," in relation to her retaliation claim.

[19] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

to the employer to articulate a legitimate, non-retaliatory reason for the adverse action.  *Id.*  If the employer provides such a reason, "the burden shifts back to the employee to demonstrate that the employer's proffered reason was pretextual by presenting evidence sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."  *Id.* (citation omitted).

Defendant concedes for purposes of summary judgment that Plaintiff can meet her burden of establishing a prima facie case of FMLA retaliation.  [Doc. 46-1 at 18.]  Defendant argues, however, that Plaintiff cannot show that its stated reason for firing Plaintiff—"continued poor performance"—was pretext for retaliation.  [Doc. 48-1 at 19-25.]  Under the *McDonnell-Douglas* framework, this suffices, and the burden shifts back to Plaintiff to show that the proffered reasons were pretextual.

Plaintiff counters that she has demonstrated pretext based upon evidence tending to show, among other things, that (1) Plaintiff's stated reason for her discharge is contradicted by evidence that she in fact performed well; (2) Defendant violated its own policies in terminating her employment without a PIP, any other warning, or a chance to improve her performance; (3) the Contracts Project—on

37

which her lack of progress was cited in justifying her discharge—remains uncompleted; (4) the decision to fire her was in close temporal proximity to her requests for FMLA leave; and (5) Cliett expressed annoyance at her need for leave. [Doc. 17 at 8-11.]

To demonstrate pretext, a plaintiff must show enough "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Morgan v. Orange Cnty., Fla.*, 477 F. App'x 625, 628 (11th Cir. 2012) (quoting *Chapman*, 229 F.3d at 1024) (quotation marks omitted). Even so, a plaintiff can rely on a wide variety of circumstantial evidence to prove that the employer's proffered reason for discharging her was pretextual and that the real reason retaliatory in nature. *See Smith*, 644 F.3d at 1328-29. Indeed, the same circumstantial evidence supporting a prima facie case may be used in the pretext analysis. For example, temporal proximity is evidence of pretext, even if it does

38

not establish pretext in isolation. *Jackson v. Hennessy Auto*, 190 F. App'x 765, 768 (11th Cir. 2006); *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006).

Here, Plaintiff has presented numerous inconsistencies and weaknesses regarding Defendants' stated reason for her discharge, along with facts suggesting her protected activity in requesting FMLA leave was the actual reason. First, Plaintiff highlights the fact that she received only praise and positive feedback from her supervisors, Cliett and Wright. Indeed, Plaintiff has presented evidence, which if believed, tends to show that, during her two decades as an employee at Northside, her supervisors rated her as meeting or exceeding expectations overall in all of her performance reviews, that neither Cliett nor Wright ever had any negative feedback to share with her about her performance, and that, to the contrary, Wright in particular had only positive feedback about her performance. And while Defendant is right to emphasize that it is the decisionmakers' beliefs about her performance (rather than Plaintiff's beliefs) that matter [*see* Doc. 46-1 at 21-23 (citing, among others, *Alvarez v. Royal Atlantic Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010))], it is also true that positive performance reviews and evidence of other positive feedback can create a genuine issue of fact regarding pretext "when the employer

claimed that it fired the plaintiff for poor performance," as Defendant does here, *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1354 (11th Cir. 2022) (citing *Barthelus v. G4S Gov't Sols., Inc.*, 752 F.3d 1309, 1315-17 (11th Cir. 2014)).

On top of this, Plaintiff was not counseled or even informed of any real performance problems, was not placed on a PIP, and was not given any warning that her employment might be terminated for poor performance. This is despite the fact that Defendant had a Performance Evaluation policy in place that generally calls for PIPs when an employee's performance falls below expectations; states that "employees should be provided feedback and coaching [from their supervisors or at least someone in the department] regarding performance issues during a performance cycle," and emphasizes that an employee should be given "ample time to demonstrate improvement." [Doc. 49-3]; (PSUMF ¶ 17.) Furthermore, Defendant's Progressive Discipline plan provides that an employee should be subject to "one or more less severe steps" than termination when "performance deficiencies" are the basis for any adverse action. [Doc. 44-1]; (PSUMF ¶¶ 19-22.) And while Defendant now stresses that Wright had discretion about whether to place Plaintiff on a PIP and argues that Wright's refusal to put her on one therefore cannot establish pretext, [Doc. 46-1 at 23-24 (citing *Ritchie v. Indus. Steel, Inc.*,

426 F. App'x 867, 873 (11th Cir. 2011))], Defendant seems to ignore that the two policies, as a whole, clearly articulate that a supervisor should engage a subordinate about performance problems in a way that allows the employee to understand and at least attempt to address those problems before that she is fired. So even if Wright retained some discretion in avoiding the policies' guidance on implementing a PIP for a struggling employee, Defendant does not offer any explanation for its overall failure to identify Plaintiff's performance issues to her in a meaningful way. As a result, a reasonable factfinder could still find Plaintiff's evidence persuasive and conclude that Defendant's refusal to implement any remedial measures whatsoever for Plaintiff's alleged performance problems—including simply informing her that they exist, which it is undisputed it did not do—amounts to a meaningful deviation from the normal procedures and guidance set out in the Performance Evaluation and Progressive Discipline policies, and therefore stands as evidence of pretext. *See Patterson*, 38 F.4th at 1354 (holding that the fact that an employee received no warnings pursuant to the "normal policies and procedures" of its human resources practices "establishes a genuine issue of material fact on pretext") (citing *Hurlbert*, 439 F.3d at 1299); *see also Hutchinson v. Sec'y, Dep't of Veterans Affs.*, 766 F. App'x 883, 888 (11th Cir. 2019) (same); *Gutter v. GuideOne Mut. Ins. Co.*, 17 F.

Supp. 3d 1261, 1272, 1273-74 (N.D. Ga. 2014) (holding that supervisor's reassurance to employee that "everything was fine" was evidence of pretext when supervisor later cited complaints and performance problems as reasons for employee's discharge).  And even if these policies had not been in place, when an employer justifies a termination decision on the basis of poor performance, evidence that an employee had "never been disciplined," and instead had been "told by her superiors that she was doing [] an admirable job," supports a finding of pretext.  *See Benz*, 732 F. App'x at 802.

Adding to this is the fact that Plaintiff's "poor performance"—at least as explained by Wright—essentially amounted failing to make sufficient progress on the Contracts Project; yet years later, the Contracts Project remains incomplete and the person currently responsible for it is—like Plaintiff was—still in need of support to complete it.  A reasonable factfinder might conclude, based upon the fact that Defendant has still not committed sufficient resources to completing the Contracts Project in a timely fashion, that Plaintiff's progress was not actually the real reason it fired her.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover

42

up a [retaliatory] purpose. Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.") (citations omitted).

Turning then to timing, then, the Court also agrees with Plaintiff that the timing of her discharge also supports a showing of pretext. Although Defendant argues that the timing should be measured either between when Plaintiff first notified Northside of her need for FMLA leave "seven months prior to her termination," or a least when it was "last requested . . . two months prior to her termination," and reject that as too distant [Doc. 46-1 at 21], its argument appears to conflate the prima facie case with the pretext analysis and ignores the fact that there is other evidence of pretext in this case (discussed both above and below).

More specifically, while "very close" temporal proximity may establish the causal element of a prima facie case of retaliation on its own, when it comes to pretext, "temporal proximity by itself generally cannot prove that an employer's proffered reasons are pretextual." *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1219-20 (11th Cir. 2021) (citing *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1137 n.15 (11th Cir. 2020)). Instead, close temporal proximity merely helps

"establish pretext when coupled with other evidence . . . ." *Gogel*, 967 F.3d at 1137 n.15.  So while it is usually the case that only "very close" temporal proximity of less than two months can establish causation, *see Ramirez v. Bausch & Lomb, Inc.*, 546 F. App'x 829, 832 (11th Cir. 2013) (citing *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)), it is also the case that when there is other evidence in support of pretext, a delay between the allegedly protected activity and the adverse activity is not fatal" to considering the evidence of temporal proximity as probative to the pretext analysis, *Ramirez*, 546 F. App'x at 832 (citing *Thomas*, 506 F.3d at 1364 and *Wascura v. City of S. Miami*, 257 F.3d 1238, 1248 (11th Cir. 2001)).[20]

In this case, Plaintiff engaged in protected activity on January 22, 2020, when she requested leave, which remained pending until January 29.  Wright prepared the first, vague memorandum about Plaintiff's alleged performance problems only five weeks later, on March 8.  Plaintiff then submitted another request for FMLA leave that was pending between March 11 and March 17, 2022.

---

[20] Relatedly and contrary to Defendant's suggestion, the Eleventh Circuit has also instructed that in FMLA retaliation cases, temporal proximity should be measured from the last day of any protected activity until the adverse employment action.  *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1273 (11th Cir. 2017).

Wright emailed Gist about terminating Plaintiff's employment on May 8, and Plaintiff was informed of her discharge on May 13, less than eight weeks after that. So while these periods are insufficient to establish pretext on their own, they may still be considered along with other information in demonstrating pretext. *See Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1328 (11th Cir. 2020); *see also Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) (up to seven weeks).

Finally, Plaintiff has testified that Cliett reacted negatively when she first informed him that she required FMLA leave for knee surgery. In particular, she testified that that he "couldn't be bothered"; said "whatever" in response to her need for leave for surgery; and appeared annoyed and rolled his eyes when he received her FLMA application notices. (DSMF ¶ 25; PSAF ¶ 42.) Defendant attempts to diminish the impacts of this by calling it "solely [] speculation," since Cliett never additionally stated to Plaintiff that she could not take FMLA leave. [*See* Doc. 46-1 at 24 (citing *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005)).] But the Court cannot agree. At issue in *Cordoba* was whether a decisionmaker knew about a plaintiff's protected activity when there was no specific evidence that the information made its way the decisionmaker, who

45

additionally denied having any knowledge whatsoever about the protected activity. *See Cordoba*, 419 F.3d at 1181.  But that is not at all comparable to the present facts, where Plaintiff testified to what she personally experienced Cliett's reaction to be.  Defendant also attempts to suggest that because Cliett was "dismissive" and condescending to most people, Plaintiff cannot show that his reaction was actually "related to her FMLA leave." [Doc. 46-1 at 24-25 (citing *Alvarez*, 610 F.3d at 1267 and *Hampton v. Amedisys Holding, LLC*, No. 1:20-cv-1874-WMR-JKL, 2021 WL 8200759, at *12 (N.D. Ga. Oct. 15, 2021)).]  But those cases, one of which was authored by the undersigned, merely stand for the proposition that indiscriminate impoliteness, unmoored from circumstances connecting such behavior to discriminatory or retaliatory motive, will not create an issue of fact about discrimination or retaliation.  S*ee Alvarez*, 610 F.3d at 1267; *Hampton*, 2021 WL 8200759, at *12.  Here, by contrast, Plaintiff specifically ties Cliett's eye rolling, negative comments, and annoyance to her protected activity by affirming that Cliett's aggravation was directly in response to him being told about her need for FMLA leave and the notifications about her actual requests for FMLA leave. (DSMF ¶ 25; PSAF ¶ 42.)  And coming from a decisionmaker with regard to the Plaintiff's discharge, such evidence supports a finding of pretext.  *See Damon v.*

*Fleming Supermkts. of Fla., Inc.*, 196 F.3d 1354, 1362 (11th Cir. 1999) ("Far from being a stray remark, the comment may evince probative evidence of the state of mind of the decisionmaker.").

To be sure, the foregoing facts are amenable to a variety of interpretations. On the one hand, faced with this evidence, a reasonable factfinder could believe Defendant's evidence and conclude that Plaintiff was making minimal progress on the Contracts Project; that Wright, Cliett, and Gist honestly did not believe that any remedial intervention would improve her performance; and that she was discharged for her poor performance when financial concerns brought on by COVID made the issue more pressing, without any regard for her need or request for FMLA leave. For this reason, Plaintiff's motion for partial summary judgment should be denied.

But on the other hand, a reasonable factfinder could see Defendant's failure to identify, must less attempt to correct, the alleged performance issues of an experienced and well-regarded employee, combined with the temporal proximity described above and other suspicious pieces of evidence, and conclude that Plaintiff performed well in her role; that she made as much progress as one person could on the Contracts Project; but that based upon her sudden need for FMLA leave for knee surgery and recovery, her supervisors decided that her discharge was the most

47

expedient way of responding to the situation, despite policies and practices calling for more lenient and remedial measures first.   Thus, viewing the evidence in the light most favorable to Plaintiff, a jury could also reasonably conclude that Defendant discharged her to avoid accommodating her need for FMLA leave or simply in response to—that is, in retaliation for—her inconvenient requests for leave.   Because of this, the Court finds that Plaintiff has put forth sufficient evidence to create a material question of fact regarding its reasons for her discharge, and Defendant's motion for summary judgment should also be denied.

## V.      CONCLUSION

In sum, genuine issues of material fact preclude summary judgment for either party.   Accordingly, it is **RECOMMENDED** that Defendant's Motion for Summary Judgment and Plaintiff's Motion for Partial Summary Judgment be **DENIED**.   [Docs. 46, 48.]

IT IS SO RECOMMENDED this 17th day of February, 2023.

JOHN K. LARKINS III
United States Magistrate Judge